232 N.J. Super. 165 (1989)
556 A.2d 1227
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RAFAEL M. RIVERA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 6, 1989.
Decided March 23, 1989.
*167 Before Judges J.H. COLEMAN, DEIGHAN and BAIME.
Alfred A. Slocum, Public Defender, attorney for appellant (Rebecca R. Pressman, Designated Counsel, of counsel and on the brief).
Rafael M. Rivera, appellant, filed a supplemental pro se brief.
Donald R. Belsole, Acting Attorney General of New Jersey; (Catherine A. Foddai, Deputy Attorney General, of counsel and on the brief).
PER CURIAM.
The crucial issue raised in this appeal is whether two attorneys assigned to represent defendant in a capital murder trial were properly removed from the case. The trial judge concluded that the two attorneys had created an actual conflict of interest by participating in a scheme to have the chief prosecution *168 witness marry defendant to deprive the State of her testimony pursuant to the marital privilege, Evid.R. 23(2). He ordered their removal from the case. We agree and affirm.
Essex County Indictment 2578-8-3 charged defendant Rafael M. Rivera with knowing or purposeful murder by his own conduct, contrary to N.J.S.A. 2C:11-3a(1) or (2) (Count One); felony murder, contrary to N.J.S.A. 2C:11-3a(3) (Count Two); robbery, contrary to N.J.S.A. 2C:15-1 (Count Three); aggravated sexual assault, contrary to N.J.S.A. 2C:14-2 (Count Four); and burglary, contrary to N.J.S.A. 2C:18-2 (Count Five). At the conclusion of a lengthy jury trial in which the State sought the death penalty, defendant was found guilty on Counts One, Three, Four and Five. He was acquitted of felony murder, Count Two. In the capital sentencing phase of the trial, the jury was unable to reach a unanimous verdict, thereby precluding the death penalty.
Following the denial of defendant's motion for a new trial, the trial judge granted the State's motion to impose an extended term on Count Four. Defendant was sentenced to life with 30 years of parole ineligibility for the murder. He was sentenced to a consecutive extended term of life with 25 years of parole ineligibility for the aggravated sexual assault. The court imposed concurrent custodial terms on the two remaining counts.
In a brief filed by counsel on behalf of defendant, and in a pro se supplemental brief, the following contentions have been raised:
I JUDGE DIOS ERRED BY REMOVING BROEGE AND GRAVES AS DEFENDANT'S TRIAL ATTORNEYS.
II JUDGE DIOS ERRED IN ADMITTING DEFENDANT'S ATTEMPT TO MARRY DIANE SANDERS AS EVIDENCE OF DEFENDANT'S CONSCIOUSNESS OF GUILT.
III JUDGE DIOS ABUSED HIS DISCRETION BY REFUSING TO GRANT DEFENDANT'S MOTION FOR A MISTRIAL.
IV JUDGE DIOS ERRED BY SENTENCING DEFENDANT TO A CONSECUTIVE TERM ON THE COUNT FOUR AGGRAVATED SEXUAL ASSAULT CONVICTION.

*169 I
On July 16, 1983, Elizabeth Cornwall, a 78 year old widow who used a cane for ambulation, was murdered in the bedroom of her second floor apartment located at 143 Flemming Avenue, Newark. She lived on Social Security payments and benefits from the Veterans Administration. Defendant, his girlfriend Diane Sanders, and their three children resided in a second floor apartment located next to the victim. The victim regarded defendant and his family as part of her extended family. She would baby-sit for defendant's children at times. The three children called the victim "grandmother."
The victim visited Sanders in Sanders' apartment several times on July 16. The last time was about 4:15 p.m. Defendant came home at approximately 4:30 p.m., while the victim was visiting, and left 15 minutes later saying he was going out with friends. The victim went home at about 5:05 p.m. A short while later, Sanders and her son James placed their ears against a common wall which separated Sanders' bedroom from the victim's bedroom after hearing suspicious noises. They heard what sounded like a bed squeaking. James also heard a man's voice in the victim's bedroom. Defendant returned home shortly after the noise ended. When Sanders told defendant about the bed squeaking and the man's voice, defendant responded that he had been in the victim's apartment looking for money when the victim walked in and surprised him. Defendant told Sanders that he struck the victim several times. In an effort to check on the victim, Sanders entered the victim's apartment through an unlocked door. From the kitchen, she saw the victim lying on the bed with her head back.
After returning home in a frightened state, Sanders called Eddie Golda, the owner of a nearby bar who was also friendly with the victim. Golda and Sanders entered the victim's apartment and he checked the victim's pulse. Being unable to feel a pulse, he concluded the victim was dead. An ambulance was called; it arrived at about 7:20 p.m. The victim was taken first *170 to University Hospital where she was pronounced dead. She was then taken to the morgue.
At or about the time the victim was taken to the morgue, defendant was visiting with another girlfriend, Jeanel Daniels, who lived on Hawkins Court in Newark. Defendant told her that he had murdered an old lady with his hands. He said he strangled her.
An autopsy was performed on July 17. It revealed the victim's face and neck were covered with bruises. There were pressure marks on the left side of her jaw. Marks on the right side of the face indicated linear abrasions surrounded by bruising. Hemorrhaging was found under the tongue, behind the eye and underneath the cheek. Bruises were located on her forearms and mid-back. Tiny abrasions were found on her lips. Gross examination of the rib cage revealed two fractured ribs. Hemorrhaging as well as black and blue marks were found which were caused by multiple impacts, probably inflicted by slapping, punching or a series of blows to the victim. The cause of death was asphyxiation due to pressure being applied to the neck and throat, commonly called strangulation.
In addition, the autopsy revealed that the victim had been sexually assaulted. Her vagina was torn in the back and was oozing blood. There was bruising of the mucous membrane and the area near the urethra. These injuries were caused by an object at least three inches in diameter such as the cane used by the victim for ambulation or defendant's hand.
Based on the autopsy report, a homicide investigation was undertaken by Detectives Jack Eutsey and Charles Conte of the Newark Homicide Squad. Detective Eutsey took a statement from Sanders on July 17, and 18. Sanders also gave statements to Investigator Roger Spain of the Essex County Prosecutor's Office on July 17, 18 and 19, 1983. In her first statement, Sanders identified a male named Dennis as the only suspect and she did not indicate that defendant lived with her. But when detective Eutsey spoke to defendant a second time, he said "I *171 killed her." Defendant was arrested and charged with the various crimes. He gave a written statement which was admitted as evidence during the trial.

II
The first three points raised by defendant are interconnected and will be discussed together because they all implicate evidence of defendant's attempt to marry Sanders. Defendant contends the trial judge erred when he ordered the removal of his two prior attorneys "because of a conflict of interest caused by their involvement with attempts to have defendant marry Sanders and because of the potential that they would be witnesses." Defendant also contends the trial judge should have excluded evidence that he attempted to marry Diane Sanders to prevent her from testifying against him. Defendant argues that if this evidence had been excluded, there would have been no basis for removal of the attorneys. Finally, defendant asserts that even if the attorneys were potential witnesses, his waiver of a conflict of interest should have been accepted by the trial judge thereby enabling the attorneys to continue in the case.

A
The facts pertinent to these contentions have a distasteful, if not unprofessional and criminal, overtone. The indictment was returned on August 25, 1983. Shortly thereafter, E. Carl Broege and William Graves were assigned to represent defendant charged with a capital offense. At some point prior to July 20, 1984, the prosecutor obtained information that defendant was attempting to marry Sanders to make her unavailable as a witness to the State pursuant to Evid.R. 23(2). Armed with that information, on July 20, 1984, the Essex County Prosecutor argued a motion before the assignment judge seeking to restrain defendant from marrying Diane Sanders, a key prosecution witness. While defendant was confined to the *172 Essex County Jail pending the trial, he told Correction Officer Joseph Rilli that he planned to marry Sanders and that he needed to have a premarital application form signed by a doctor. An affidavit of Officer Rilli formed the basis for an application for a restraining order. On July 20, the assignment judge issued a Show Cause Order. He temporarily restrained defendant from marrying Sanders. The Show Cause Order was made returnable for August 17, 1984.
The return date on the Show Cause Order was adjourned until October 19, 1984. On that date counsel for defendant agreed to continue the restraints pending the trial. On the same date, the judge conducted an Evid.R. 8 hearing at the request of the State to determine whether Sanders would testify at the trial and what her testimony would be. This application was made because the Public Defender, at the request of Broege, had assigned an attorney to represent Sanders ostensibly because Sanders gave conflicting statements to police officers on July 17 and 18, 1983. Sanders' attorney served notice of representation of Sanders on the prosecutor on January 25, 1984. The prosecutor alleged that after Sanders obtained counsel, he was unable to confer with her. During the hearing, Sanders testified that in the summer of 1984, she made plans to marry defendant to avoid testifying at the trial. She said she did not wish to marry defendant, but Broege told her "if I marry him [defendant], this way I wouldn't have to testify."
At the request of defendant, another Evid.R. 8 hearing was conducted on December 20, 1984 to determine whether the State would be permitted to place before the jury evidence of defendant's attempts to marry Sanders. The State represented that it intended to introduce such evidence as consciousness of guilt. The State argued that attorneys Broege and Graves were in a position of conflict because they were potential witnesses and may not provide defendant the best representation out of concern for themselves. The judge held that the *173 evidence of defendant's attempts to marry Sanders was admissible in the trial before a jury.
The trial judge ordered removal of the attorneys from the case on December 20, 1984 without conducting a full hearing. Upon leave granted on March 18, 1985, we summarily reversed and remanded the matter to the trial court to conduct a full hearing on whether to exclude evidence of defendant's attempts to marry Sanders and whether to disqualify the attorneys. The hearing on remand was conducted on April 30, 1985. During this hearing Sanders testified that Broege discouraged her from cooperating with the State by telling her it was best for her not to talk to the State. Broege obtained an attorney for her even though she never wanted an attorney. She stated that Broege told her that if she married defendant, she would not have to testify. Broege paid for a blood test required for marriage. When she told defendant she would marry him, defendant said he would win his case.
At the conclusion of that hearing, the trial judge again concluded that evidence of defendant's attempts to marry Sanders was admissible. On May 6, 1985, the trial judge ordered that attorneys Broege and Graves could not continue to represent defendant because they were actively involved in the marriage attempts and therefore in a position of conflict. He concluded they had probably engaged in unethical and criminal conduct. He also concluded they were potential witnesses. A motion for reconsideration was denied.

B
The issue of whether the attorneys should have been disqualified must be based on the evidence presented during the motion for a restraining order and the hearings conducted pursuant to Evid.R. 8. Based on our careful study of these records, we are in complete agreement with the trial judge that defendant attempted to marry Sanders solely for the purpose of disqualifying her as a witness under Evid.R. 23(2). Broege and *174 Graves conceded that if the marriage was performed, they would invoke the marital privilege under Evid.R. 23(2).
As the trial judge correctly observed, even though defendant had been dating Sanders for 15 years and had lived with her for approximately six years by July 1983 and had fathered three children by her, Sanders had rejected all prior proposals for marriage to defendant. Compelling evidence was presented which established that defendant stated that he wanted to marry Sanders so he could win the case. Consequently, we find overwhelming evidence in the record to support the trial judge's determination that defendant attempted to marry Sanders solely to prevent her from testifying for the State. State v. Johnson, 42 N.J. 146, 162 (1964).

C
We are also persuaded that the trial judge did not err in ruling that defendant's attempts to marry Sanders was admissible as evidence of consciousness of guilt. Evid.R. 63(10) allows the admission of hearsay statements that would subject the declarant to criminal liability. State v. Schumann, 111 N.J. 470, 477 (1988). A declaration or conduct subsequent to the commission of a crime which indicates consciousness of guilt, or is inconsistent with innocence, is admissible. State v. Rechtscaffer, 70 N.J. 395, 413 (1976). Conduct, be it threats or otherwise, designed to prevent or to induce a state witness to stay away from a trial or not testify against the accused is admissible as evidence of consciousness of guilt. Id. at 414; State v. Hill, 47 N.J. 490, 500 (1966); State v. Lassiter, 197 N.J. Super. 2, 8 (App.Div. 1984). Here, the purpose of the testimony concerning the marriage attempts was to demonstrate defendant's determination to deprive the State of highly incriminating evidence which Sanders was able to offer. The conduct of defendant was inconsistent with his claim of innocence and therefore admissible as evidence.

*175 D
Defendant argues further that the evidence of the attempts to marry Sanders should have been excluded under Evid.R. 4. He urges that the marriage attempts must be attributed to Broege and Graves and not to him and that the admission of that evidence was unduly prejudicial to him. We reject these assertions.
As noted previously, we are completely satisfied from the hearings conducted out of the presence of the jury that defendant was an active participant in the marriage attempts solely to deprive the court of Sanders' testimony. In addition, the evidence placed before the jury respecting the marriage attempts compellingly established that defendant and his two attorneys were active participants in the marriage scheme. Sanders testified that in the fall of 1983, defendant telephoned her and asked her to marry him and she said no. Shortly thereafter, Broege told her that if she married defendant, she would not have to testify. In December 1983 Broege told her not to talk to anyone and he arranged to get her an attorney. On April 23, 1984 Sanders was interviewed by the prosecutor in his office in the presence of her attorney, Nicholas DiPalma. She admitted there were conflicts and untruths in her July 17, 1983 statements to law enforcement officials. Defendant told her he was aware of her conflicting statements because he had received her statements as part of the discovery. During the months of March, April, May and June, 1984, defendant called Sanders once or twice daily. He asked her to marry him. Initially, she said no, but she later said yes. When she said yes, defendant said he would win his case because she would not be able to testify.
Sanders had a blood test performed on June 8, 1984 at the office of Dr. Kaos. Because she did not marry within a specified time period, a second test had to be performed. The second test was also performed by Dr. Kaos and this one was paid for by Broege. Defendant told Sanders that Broege would *176 make all necessary arrangements on defendant's behalf because defendant was confined to the Essex County Jail. A June or July 1984 wedding was planned. The marriage did not occur because of the July 20, 1984 restraining order.
Corrections Officer Joseph Rilli also testified before the jury respecting the marriage attempts. He testified that on July 19, 1984 defendant showed him a premarital certificate which he wanted signed by a doctor so he could marry Sanders. Defendant was housed on the eighth floor and he needed to get to the twelfth floor to get a doctor to sign the certificate. Defendant had already completed a blood test on June 28, 1984. The doctor on duty at the time was also an inmate. Officer Rilli did not take defendant to the twelfth floor to see a doctor. He reported the incident to the Essex County Prosecutor. Broege and Graves did not testify during the Evid.R. 8 hearings or before the jury.
The jury was given special instructions concerning the use of the evidence of attempts to marry Sanders. The jury was told:
* * * * * * * *
So once an accused married he attains the privilege as to the testimony of his spouse and can prevent the spouse from testifying. I explained that to you, ladies and gentlemen, because there has been some testimony in this case from which you may infer that the defendant attempted to marry Diane Sanders after the alleged  the commission of the alleged crime. The question of whether the defendant wanted to marry Diane Sanders is another question of fact for your determination. If after a consideration of all the evidence you find that the defendant, fearing that the witness Diane Sanders would testify against him, attempted to marry her for the purpose of invoking the spousal immunity, then preventing her from testifying against him, then you may consider such attempt to marry in connection with all the other evidence in the case as an indication or proof of consciousness of guilty.
Our careful review of the record persuades us to conclude the evidence of defendant's attempts to marry Sanders "was clearly admissible as illuminating defendant's consciousness of his own guilt." State v. Lassiter, supra, 197 N.J. Super. at 8. The evidence was such as to permit an inference that defendant was not simply a passive player who merely relied on the advice of his attorneys. He not only knew the impact the marriage would have on the State's case, he actively and gleefully *177 participated in the scheme. Further support for this conclusion is found in the fact that approximately one week after Broege and Graves were removed from the case, defendant wrote a threatening letter to Sanders on May 15, 1985. The letter in part stated "Diane, you are a hard woman to deal with but I tell you the truth, you aren't shit. You are on my shit list. I don't give a f____ what you do anymore. I'm sick and tired plus you're going against me all the way."
We are also satisfied that the evidence of the marriage attempts should not have been excluded under Evid.R. 4. The evidence had substantial probative value far in excess of any prejudicial impact. State v. Carter, 91 N.J. 86, 106 (1982). It supported the credibility of Sanders' testimony pertaining to defendant's involvement in the crimes and was not inflammatory in the least. The evidence did not depict defendant as a person bent on criminal activity. Rather, it merely portrayed conduct that was inconsistent with defendant's claim of innocence. It also underscored defendant's failure to demonstrate factors favoring exclusion which substantially outweighed its probative value. We find no palpable abuse of discretion and hence no manifest denial of justice. State v. Bass, 221 N.J. Super. 466, 484 (App.Div. 1987).
Further, we agree with the trial judge that removal of Broege and Graves from the case was proper under the unique circumstances. It is beyond dispute that a defendant in a criminal case is entitled to be represented by the counsel of his or her own choice. Chandler v. Fretag, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954); Morris v. Slappy, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); State v. Reddy, 137 N.J. Super. 32, 35 (App.Div. 1975). But there is no absolute right to a particular counsel. United States ex rel. Carey v. Rundle, 409 F.2d 1210, 1215 (3 Cir.1969), cert. den. sub nom. Carey v. Rundle, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970); State v. Reddy, supra, 137 N.J. Super. at 35. See also United States v. McKeon, 738 F.2d 26, 35 (2d Cir.1984) where counsel was disqualified under a disciplinary rule when it became *178 necessary for counsel to testify at trial; Grady v. United States, 715 F.2d 402, 404 (8th Cir.1983), where defendant's right to counsel of choice was outweighed by the need to preserve public confidence in the judicial system when the chosen attorney allegedly engaged in improper and unethical conduct.
A defendant's right to counsel of his or her choice is further limited in that "there is no right to demand to be represented by an attorney disqualified because of an ethical requirement." Reardon v. Marlayne, Inc., 83 N.J. 460, 477 (1980); Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988); State v. Lucarello, 135 N.J. Super. 347, 353 (App.Div.), aff'd o.b. 69 N.J. 31 (1975). Licensed attorneys employed or retained by the Public Defender are subject in every respect to the rules governing the professional conduct of lawyers. In re Advisory Opinion No. 544 of N.J. Sup. Ct., 103 N.J. 399, 404 (1986). The motion to disqualify Broege and Graves required the trial judge to balance the competing interest of the need to maintain the highest standards of the profession and the right of defendant to proceed with counsel of his choice. Dewey v. R.J. Reynolds Tobacco Co., supra. See also RPC 1.2(d) and (e); RPC 1.7(b); RPC 1.16(a)(1) and (b)(1).
The trial judge recognized the need for this balancing. After examining the evidence presented, he concluded Broege and Graves had engaged in unethical, if not criminal, conduct in several respects: (1) Broege advised Sanders not to cooperate with the police or prosecutor, (2) Broege obtained an attorney for Sanders to prevent her from talking to law enforcement persons, and (3) Broege's participation in a scheme to have Sanders marry defendant to deprive the State of a key witness. For purposes of this appeal this conduct implicates possible violations of RPC 1.2(d) and (e), 1.7(b); 1.16(a)(1) and (b)(1); 3.7; N.J.S.A. 2C:29-1 and N.J.S.A. 2C:28-5. See also In re Garber, 95 N.J. 597, 609 (1984). The trial judge concluded that Broege and Graves were in a position of conflict as potential witnesses and because they would not be able to pursue an unrestrained *179 course of action while representing defendant for fear of exposing or substantiating possible unethical or criminal involvement on their part.
We fully agree with the trial judge that Broege and Graves were in a position of actual conflict of interest which jeopardized defendant's constitutionally protected right to effective assistance of counsel. See State v. Fritz, 105 N.J. 42, 58 (1987); State v. Gary, 229 N.J. Super. 102, 115-116 (App.Div. 1988). Once they became actual participants in the marriage scheme, their effectiveness as counsel was hampered because of divergent interest and divided loyalty. See State v. Bell, 90 N.J. 163, 171-175 (1982); State v. Bellucci, 81 N.J. 531, 543 (1980); State v. Land, 73 N.J. 24, 31 (1977). In the circumstances, it would be sophomoric to believe that the two attorneys could be single-minded in their representation of defendant and that their intellectual focus had not become cloudy. Unlike the facts in State v. Williams, 80 N.J. 472 (1979), where defense counsel engaged in proper, albeit foolishly, trial preparation and became a potential witness in the case, the attorneys here engaged in improper conduct which created a conflict of interest. The conflict of interest created such a substantial likelihood of prejudice to defendant in this capital case that the only viable course of action was to remove the attorneys. See State v. Bell, supra, 90 N.J. at 171.

E
Defendant urges that the court should have accepted his waiver of the conflict of interest of the attorneys. The motion for waiver was addressed to the trial judge's discretion. In this capital case, defendant's understanding of the ramifications of the attempted waiver of a conflict is quite dubious. See RPC 1.7(c)(1). The conflicts presented here simply could not be cured through defendant's consent. We view the attempted waiver as nothing more than gamesmenship, State v. Laganella, 144 N.J. Super. 268, 281 (App.Div. 1976), designed to hoodwink the trial judge into committing reversible error. See *180 State v. McCombs, 81 N.J. 373, 390 (1979), Hughes, C.J., dissenting.
There are higher values at stake in a capital case than defendant's right to have a particular attorney represent him. State v. Wiggins, 158 N.J. Super. 27, 32 (App.Div. 1978). Where, as here, there can be no effective waiver of a conflict of interest or waiver of effective assistance of counsel, it is not improper for a trial judge to remove the attorneys. What the United States Supreme Court stated recently is dispositive of the waiver issue raised here.
Thus, where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver.... As the Court of Appeals for the Third Circuit stated in United States v. Dolan, 570 F.2d 1177, 1184 (Cir. 3 1978):
`[W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court,
but it is also detrimental to the independent interest of the trial judge to be free from future attacks on the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.' [Wheat v. United States, ___ U.S. ___, ___-___, 108 S.Ct. 1692, 1698-1699, 100 L.Ed.2d 140, 150-151 (1988)]

III
During the trial, Sanders testified that she did not implicate defendant in her first statement to the police because she was afraid of defendant who had beaten her once requiring hospitalization. A motion for a mistrial was denied and defendant now contends this was error. We disagree. The answer explained why Sanders wanted to protect defendant in her first statement to a law enforcement official. A voir dire of each juror was conducted to make certain each juror understood the limited purpose for allowing that evidence. Defense counsel prevailed upon the trial judge to instruct the jury that it could not consider that evidence to show defendant's propensity for *181 violent behavior. Given the extraordinary precautions taken by the court, we find denial of the motion for a mistrial was not an abuse of discretion. State v. Atkins, 78 N.J. 454, 462 (1979); State v. Thomas, 76 N.J. 344, 362 (1978). We are satisfied the jury followed the court's forceful and immediate cautionary instruction. State v. Winter, 96 N.J. 640, 646-647 (1984).

IV
Finally, defendant contends his double life sentences with 55 years of parole ineligibility are excessive. The extended term of life for the aggravated sexual assault was based on defendant's status as a persistent offender. N.J.S.A. 2C:44-3a. Defendant concedes he was a persistent offender within the meaning of the statute. Defendant argues that the extended term for the aggravated sexual assault should run concurrently rather than consecutively to the murder sentence.
We have examined this contention in light of the record and the controlling legal principles and find it is clearly without merit. See State v. Dunbar, 108 N.J. 80 (1987); State v. Miller, 108 N.J. 112, 122 (1987); State v. Yarbough, 100 N.J. 627 (1985), cert. den. 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986); State v. Roth, 95 N.J. 334 (1984); State v. Hodge, 95 N.J. 369 (1984); State v. Mosch, 214 N.J. Super. 457, 465 (App. Div. 1986), certif. den. 107 N.J. 131 (1987). The aggravated sexual assault upon the 78 year old victim was completely unrelated to causing death by strangulation. In the circumstances of this case, the consecutive life with 25 years of parole ineligibility was not manifestly excessive.
The judgment of conviction is affirmed.[1]
NOTES
[1] After our opinion was filed, we were made aware that the Supreme Court of New Jersey District Ethics Committee for Essex County, District V-A, conducted an investigation of possible misconduct by the attorneys. The person assigned to conduct the investigation concluded that although the attorneys should be condemned for surreptitiously tape recording an interview with Sanders without the presence or consent of counsel assigned to represent her, the conduct of the attorneys did not violate any provision of the Disciplinary Rules of Professional Conduct. Based on that report, the chairperson dismissed the charges.