STATE OF NEW JERSEY IN THE INTEREST OF L.D.,
JUVENILE-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 25, 1979—Decided February 22, 1980.

Before Judges FRITZ, KOLE and LANE.

*Jeffrey J. Chornoboy,* Assistant Prosecuting Attorney, argued the cause for appellant State of New Jersey (*John H. Stamler,* Union County Prosecutor, attorney; *Michael J. Zidonik,* Assistant Prosecutor, on the brief).

*Robert J. Konzelmann,* Assistant Deputy Public Defender, argued the cause for respondent (*Stanley C. Van Ness,* Public Defender, attorney; *Robert J. Konzelmann* on the letter brief).

The opinion of the court was delivered by

FRITZ, P. J. A. D.

The sole issue presented in this appeal is whether the dismissal of a complaint against a juvenile after a proceeding in the Juvenile and Domestic Relations Court, at which only the juvenile defendant appeared and related his version of the incident in question, bars, by reason of double jeopardy, prosecution of a later complaint charging the same juvenile with the same offense.

The circumstances are unique. It is unlikely the identical situation will recur. We mention this at the outset because important double jeopardy considerations have been here debated and we are interested that this opinion not be read more broadly than is intended. For instance, we do not decide here whether an adjudication on an "informal hearing" occurring in the usual predictable procedural course of things precludes a later "formal hearing." See *State In Interest of J.J.,* 132 *N.J.Super.* 464 (J.&D.R.Ct.1975).

We borrow from the recitation of procedural facts which appears in the written opinion of the trial judge. Other than with respect to certain exceptions we take and to which we advert immediately thereafter, this appears correctly to reflect that which did in fact happen:

On January 8, 1978, a complaint was filed by [complainant] against the juvenile, [L.D.], charging commission of an assault and battery upon complainant on January 7, 1978. The matter was first listed on the representation mandatory calendar, and subsequently, with the consent of the Prosecutor, was transferred by the presiding judge to the representation not mandatory calendar. It was ultimately listed for hearing on March 16, 1978, before this court. On the same date, hearing was listed as to a co-defendant . . . on a complaint filed by another complainant arising out of the same incident, as well as on several other unrelated complaints filed against [co-defendant], all of these being listed on the representation mandatory calendar. Counsel for [co-defendant] requested an adjournment of the March 16th hearing; for that reason, and since this court was personally acquainted with the victim in one of the other complaints filed against [co-defendant], this court ordered that all of [the co-defendant] hearings be adjourned for hearing by another judge. It now appears that the Prosecutor, although not involved in the [L.D.] hearing, assumed that it also would be adjourned, and without the court's knowledge, advised the complaining witness . . . that the [L.D.] hearing had been adjourned. As a result, the complaining witness did not appear. When the case was called, [L.D.] and his parents appeared and requested that the matter then be heard, citing several earlier appearances in court. The defendant stated that he did not believe that his conduct on the day in question constituted an assault, and asked to be permitted to testify. The court agreed to hear the case, determined that the complaining witness had not appeared although duly notified, and heard the defendant's testimony. The court then dismissed the complaint against the defendant. Subsequently, on March 23, 1978, the Prosecutor filed a new and identical complaint against the juvenile, alleging the same facts and charge. That complaint was listed on the representation mandatory calendar, and the Public Defender's office, representing the defendant, has now moved to dismiss the complaint, on the ground of former jeopardy.

The trial judge granted the motion to dismiss and filed a written opinion. This appeal by the State followed. *R.* 2:3–1(b).

Four important additions, amendments or corrections to the above abstract from the written opinion of the judge have substantial significance. First, with respect to the "assumption" of the prosecutor that the L.D. matter would be adjourned, it would appear that the prosecutor reasonably believed that the L.D. hearing and the hearing for the codefendant would be listed "both the same date and time." Second, while it is true

that the parents referred to earlier appearances and requested that the matter be heard, it is to be observed that neither of the two (at most) prior appearances were for adjudicatory hearing purposes. Of perhaps greater significance, the desire to be heard really sprang from a desire not to be tried with the codefendant. No question remains regarding the motivation of the parents after this colloquy with the court is considered:

> [MOTHER]: Well why can't you try him? [The codefendant's] is very bad. The, the situation with [codefendant] is completely different. If [L.D.] is tried with [codefendant], I mean that's going to make it look bad for [L.D.]—
>
> [FATHER]: It's going to make it look bad on my son.
>
> [MOTHER]: —because [codefendant] has, has a lot of offenses against him and this is not his first offense. My son is, has never been in trouble.

Third, despite the statement of the trial judge in his opinion, he never really "agreed to hear the case." Beleaguered by the entreaties of L.D.'s parents, alternating in their supplications that the case not be adjourned to a time when their son would be tried with the "very bad" codefendant, the judge finally said only, "Please. All right, Mrs. [D]." Then addressing defendant, he said without any explanation, "[S]uppose you tell me what happened." No one was there to represent the State's interest by cross-examination. No one was there to contradict by direct testimony. The witness, a senior in high school only three months short of his 18th birthday, was not even sworn. Fourth, if the trial judge did in fact determine that "the complaining witness had not appeared although duly notified," those facts simply do not appear in the record (other, of course, than the fact that there were no State's witnesses at that first proceeding). The fact of such determination and its nature is not recorded and the whole record is hopelessly unclear respecting due notification of the complaining witness. As earlier noted, the reasonable expectation of the prosecutor respecting the consolidation would indicate to the contrary.

Eventually the judge said simply, "Okay, Complaint dismissed." There were no findings, no conclusions, no determination. Just an announcement that the complaint had been dismissed.

During the course of both this proceeding and the subsequent argument of the juvenile's motion to dismiss the reinstituted complaint, the trial judge recognized the vulnerability of his position. In fact, he said to L.D. at the first proceeding, "The problem of course is that we don't have the other side of the story, [L.], and if I decide this I'm really deciding it on your statements alone." At the latter hearing he conceded that, "Unhappily I simply said, 'Complaint dismissed.' " Immediately thereafter he endeavored to volunteer the reasons he had said this, but even then he couched this explanation only in terms of what these reasons "probably were."

In these circumstances we are satisfied that neither the formalistic expression of double jeopardy prohibitions in terms of a particular time at which "jeopardy attaches," *State v. Locklear,* 16 *N.J.* 232 (1954), nor the more subjective concept of the invocation of a bar on account of concern for due process or fair play, *see State v. Laganella,* 144 *N.J.Super.* 268, 284 (App.Div. 1976), app. dism. 74 *N.J.* 256 (1976), militates against the second complaint here or justifies its suppression. Accordingly we reverse.

At the outset we observe that while at one point there may have been some doubt in New Jersey respecting the reach of constitutional protection in a proceeding involving a juvenile in terms of equivalents in the adult criminal procedure, *State in the Interest of Carlo,* 48 *N.J.* 224, 234–235 (1966) (and see especially the concurring opinion of Chief Justice Weintraub), we know now that many if not all basic substantial constitutional protections do indeed belong to the juvenile in the juvenile proceeding. *Re Gault,* 387 *U.S.* 1, 87 *S.Ct.* 1428, 18 *L.Ed.*2d 527 (1967). These include that against double jeopardy. *Breed v. Jones,* 421 *U.S.* 519, 95 *S.Ct.* 1779, 44 *L.Ed.*2d 346 (1975). In fact, the dynamics tend toward an expansion of the rights and protections afforded juveniles in both the federal and state courts. *State in Interest of W.M.,* 147 *N.J.Super.* 24, 26 (App. Div.1977). Whatever the outside limit of these perimeters may now be we are wholly satisfied they embrace a proscription against double jeopardy and require the assurance of due proc-

ess. This requirement of due process—which is nothing more than fair play—is entrenched in the native heart as much by its nature as by the Constitution. Its mandate has never been in doubt. *Carlo, supra.* We endeavor to make its welcome as warm in our courts as we claim to do on our sporting fields. The difficulties arise not from any lack of sincerity or vigor in the acceptance of the due process and double jeopardy concepts. Rather, the problem is one of identifying when the factual circumstances trespass upon the off-limits territory.

With respect to double jeopardy, the easiest definition has generally been framed in terms of jeopardy "attaching" when a jury has been impaneled and sworn, or upon the occurrence of an event in nonjury proceedings which resembles that. *State v. Rechtschaffer,* 70 *N.J.* 395, 404 (1976). As objective as this formula seems to be, exposure to jury consideration does not always prohibit a second trial. *United States v. Perez,* 22 *U.S.* (9 *Wheat.*) 579, 6 *L.Ed.* 165 (1824). For instance, "manifest necessity" and "the ends of public justice" remain recognized as concepts justifying a review of "the singular facts and circumstances of each case" in order to determine whether the bar should be imposed. *Rechtschaffer, supra,* 70 *N.J.* at 405; *State v. Lynch,* 79 *N.J.* 327, 341 (1979). In *State v. Laganella, supra,* we recognized that this is because "important interests other than those of defendant alone are involved." 144 *N.J.Super.* at 287. We held there that proper circumstances should permit and perhaps require a denial of the double jeopardy bar even after the case for the State has been fully presented to the factfinder. *Compare United States v. Scott,* 437 *U.S.* 82, 98 *S.Ct.* 2187, 57 *L.Ed.2d* 65 (1978), reh. den. 439 *U.S.* 883, 99 *S.Ct.* 226, 58 *L.Ed.2d* 197 (1978). We think, for these and other reasons, that the same restraint should be exercised against a tendency to apply double jeopardy considerations automatically in a case such as this where the State did not even present a case and defendant's statement was in essence volunteered by virtue of his and his parents' unflagging insistence that he not be heard in tandem with one they conceived to be a scoundrel.

■ Here the juvenile refused to accede to an adjournment at a time when the State was not present and reasonably not prepared to proceed. This refusal was for personal reasons not related to the absence of the State or its unpreparedness. We are satisfied that this circumstance, although only distantly akin to the avoidance of a trial on the merits by the motions of defendants in *Scott* and *Laganella, supra,* invokes principles strikingly like those which there controlled. Here the juvenile in essence volunteered his version of the occurrence—indeed implored the court to listen to it at a time when the State was not present and there was no one to cross-examine in the public interest—in a determined effort to avoid being tried at another time with another person. In these circumstances, despite the fact that the juvenile recited facts before a judge—an occurrence generally marking the "attachment of jeopardy," *Breed v. Jones, supra,* 421 *U.S.* at 531, 95 *S.Ct.* at 1786—we are hard put to say the juvenile was "put to trial." *Ibid.* Cf. *Serfass v. United States,* 420 *U.S.* 377, 95 *S.Ct.* 1055, 43 *L.Ed.2d* 265 (1975), in which the dissent demonstrates that there, as here, there was evidence sufficient to constitute a defense on the merits.

As we did in *Laganella,* we ponder the question as to whether these circumstances should produce a departure here from the governing doctrine announced in *State v. Rechtschaffer, supra; State v. Kleinwaks,* 68 *N.J.* 328 (1975), and *State v. Sims,* 65 *N.J.* 359 (1974). We think not.

We are not at all unaware that the appeals in these cases proceeded from guilty verdicts in the trial court. Here we have no prior adjudication of guilt. Nor do we have an acquittal by reason of innocence. The judge merely said he was "going to dismiss the complaint." After being told by the interested parents that a previous complaint was improvidently signed (by the mother), volunteering an opinion respecting the juvenile that "[f]rom your record it looks as though you're okay" and receiving from the parents assurances that "he's really a good boy," the judge simply said, "Complaint dismissed." The record reveals no "resolution . . . of some or all of the factual elements of the offense charged." *United States v. Martin*

*Linen Supply Co.*, 430 *U.S.* 564, 571, 97 *S.Ct.* 1349, 1355, 51 *L.Ed.* 2d 642 (1977). Nor are we inclined to imply factual resolution from a bare dismissal framed in inquiries as to the juvenile's record in court and in school. We recognize that a reversal here requires an extension of the determinations of *Rechtschaffer, Kleinwaks* and *Sims* with their guilty verdicts. But a reversal here does no violence at all to the principles announced in those cases. Indeed, those principles seem to us to mandate a reversal and we undertake that course without hesitation.

Had the juvenile been adjudicated a delinquent in these proceedings we are confident of the vulnerability of that judgment, arriving as it would have had to on testimony solely from the lips of the accused. There could have been no supportable conviction because, if the juvenile was credible, he was entitled not to be convicted, and if he was not credible, there was no other evidence to convict him in any event. Since no viable conviction could possibly result, the juvenile was never in jeopardy.[1] *See State in Interest of C.V.*, 146 *N.J.Super.* 573 (App. Div.1977), certif. den. 74 *N.J.* 258 (1977). The definitional "risk" of *Breed v. Jones, supra,* was notably absent.

■ Of course, a determination that jeopardy has not "attached" does not conclude the inquiry. As noted above, fair play dressed in a garb we have learned to call due process may in proper circumstances preclude further proceedings. It is this rule which is designed to prevent an unfair "marshalling of the vast resources of the state against an individual" (*State v. Sims, supra,* 65 *N.J.* at 371) with a consequence of "the oppressions and persecutions of arbitrary government" from which we have resolutely determined to "shield the freeman." *State v. Labato,* 7 *N.J.* 137, 144 (1951). However, no suggestion appears in the record before us of any such marshalling, oppression or untoward prosecution.

---

[1] The hearing judge candidly conceded that had L.D. related facts "sufficient to form the basis of an assault and battery," he would probably not have found L.D. guilty. He concluded this comment with the statement, "I don't know. I don't—that's not fair to say. That's not fair to say."

Here, as in all double jeopardy matters, "the emphasis should be on underlying policies rather than technisms. The primary considerations should be fairness and fulfillment of reasonable expectations in the light of the constitutional and common law goals." *State v. Currie,* 41 *N.J.* 531, 539 (1964). Beyond this, "[i]t is well settled that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *State v. Kluber,* 130 *N.J.Super.* 336, 344 (App.Div.1974), certif. den. 67 *N.J.* 72 (1975). *Accord, State v. Farmer,* 48 *N.J.* 145, 169–170 (1966), *cert.* den. 386 *U.S.* 991, 87 *S.Ct.* 1305, 18 *L.Ed.*2d 335 (1967).

In the circumstances of this matter, no constitutional or other prohibition appears to us to prevent the assertion of the public's interest in a trial on the merits designed to end in a judgment just to all interests. Certainly understandably, human compassion on the part of a hearing judge for parents pleading against a joint trial should not be permitted to frustrate that salutary purpose of the law.

Reversed. The complaint is reinstated and the matter is remanded for hearing. We do not retain jurisdiction.